IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH RAGHAVGS2017@GMAIL.COM THAT IS STORED AT PREMISES CONTROLLED BY GOOGLE LLC. | Case No. 1:20-mj- 142-01-AJ<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Jason Rameaka, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain account (raghavgs2017@gmail.com, or "the subject account") that is stored at premises controlled by Google LLC., an email provider headquartered at 1600 Amphitheatre Parkway, Mountain View, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google LLC. to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      I am a Special Agent with the United States Food and Drug Administration, Office of Criminal Investigation ("FDA/OCI"), and have been so employed since August of 2013.  I was previously employed as a Special Agent with Criminal Investigation, Internal Revenue Service, United States Department of the Treasury, since April of 2000.  I have attended numerous federal agency sponsored training courses as well as courses at the Federal

Law Enforcement Training Center focused on financial investigations, food and drug law, federal narcotics violations, money laundering, and various other topics.

3.      As a Special Agent with FDA/OCI, I am responsible for conducting criminal investigations involving violations of the Federal Food, Drug, and Cosmetic Act ("FDCA"), Title 21, United States Code, §§ 301, et seq., and other federal statutes enforced by the FDA. I am assigned to OCI's Cybercrime Investigations Unit and am familiar with the tactics, methods, and techniques of persons who unlawfully market and distribute drugs via internet websites.

4.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. While I have set forth all material information pertinent to the requested search warrant, the affidavit does not include all of my knowledge about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, §§ 331(a), 331(d) (introduction of misbranded drugs into interstate commerce), 846, 841(a), (distribution and conspiracy to distribute controlled substances) 952(b), and 963 (unlawful importation of controlled substances), and Title 18, United States Code, §§ 371 and 545 (conspiracy and importation contrary to law), 1956(a)(2), and 1956(h) (money laundering) have been committed by G. KUIPER, the person using the subject account, and others.  There is also probable cause to search the information described in Attachment A for evidence, fruits, and instrumentalities of these crimes further described in Attachment B.

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), &

2

(c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction

over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## LEGAL BACKGROUND

7.      Under the FDCA, the term "drug" includes articles which are intended (1) for use

in the diagnosis, cure, mitigation, treatment, or prevention of diseases in man or (2) to affect the

structure or any function of the body of man. 21 U.S.C. § 321(g)(1)(B) and (C).

8.      Under the FDCA, the term "new drug" includes any drug that is not generally

recognized, among experts qualified by scientific training and experience to evaluate the safety

and effectiveness of drugs, as safe and effective for use under the conditions prescribed,

recommended, or suggested in the labeling thereof. 21 U.S.C. § 321(p)(1).

9.      With limited exceptions not applicable here, unless the FDA has approved a new

drug application or an abbreviated new drug application, new drugs are "unapproved" and cannot

lawfully enter into interstate commerce.  In other words, introducing or causing the introduction

into interstate commerce of a new drug that does not have an FDA-approved application, i.e. an

"unapproved" new drug, is generally prohibited. 21 U.S.C. §§ 355(a) and 331(d).

10.     Under the FDCA, certain drugs, because of their toxicity and other potential

harmful effects, are not considered safe for use except under the supervision of a practitioner

licensed by law to administer such a drug.  Those drugs, as well as drugs approved by FDA for

use only under the supervision of a licensed practitioner, are known as prescription drugs.  21

U.S.C. § 353(b)(1).

11.     Prescription drugs may be dispensed only upon the prescription of a licensed

practitioner. 21 U.S.C. § 353(b)(1). Dispensing a prescription drug without the prescription of a

licensed practitioner causes a drug to be  "misbranded." *Id.* Introducing a misbranded drug into

interstate commerce or causing the introduction into interstate commerce of any misbranded drug is prohibited. 21 U.S.C. § 331(a). The FDCA imposes strict-liability misdemeanor punishment for violations of 21 U.S.C. § 331. 21 U.S.C. § 333(a)(1); *United States v. Park*, 421 U.S. 658 (1975). The FDCA imposes felony punishment for conduct committed with the "intent to defraud or mislead." 21 U.S.C. § 333(a)(2).

12.     Certain prescription drugs are also classified as "controlled substances" under the Controlled Substances Act (hereinafter "CSA") and are subject to regulation under that statue. "Schedule IV" controlled substances, as defined by statute, include drugs determined to have accepted medical use in treatment in the U.S. and the abuse of which could lead to a limited physical dependence relative to drugs and controlled substances in other schedules. 21 U.S.C. § 812(b)(4).

13.     The CSA contains its own prohibition on dispensing of prescription drugs that are also Schedule IV controlled substances except upon the prescription of a licensed practitioner. 21 U.S.C. § 829(b). Additionally, Schedule IV controlled substances cannot be distributed or generally handled in the course of being distributed other than by persons and entities registered with the United States Drug Enforcement Administration (hereinafter "DEA"). 21 U.S.C. § 822.

14.     The importation of prescription drugs into the United States is subject to laws and regulations administered by United States Customs and Border Protection, and the FDA, and, in the case of controlled substances, the DEA. Among other things, a prescription drug may be lawfully imported into the United States only if it is approved by the FDA or exempt from approval. 21 U.S.C. § 331(d).

15.     In addition, under the CSA, it is unlawful to import, or to conspire to import, into the United States a non-narcotic Schedule IV controlled substance  unless the controlled

substance is imported for medical, scientific, or other legitimate uses and pursuant to notifications and declarations prescribed by regulation. 21 U.S.C. §§ 952(b) and 963.

16.     It is a crime for any person to fraudulently or knowingly import or bring into the United States any merchandise contrary to law. 18 U.S.C. § 545. Any importation of a  drug in violation of the CSA or the FDCA constitutes an importation contrary to law.

17.     It is a crime to manufacture, distribute, dispense or possess with intent to distribute controlled substances, or to conspire to do the same, unless authorized by the CSA and its regulations. 21 U.S.C. §§ 841(a) and 846.

18.     Knowingly or intentionally delivering, distributing, or dispensing a controlled substance by means of the internet by an online pharmacy that is not validly registered to engage in such internet activity is a crime. 21 U.S.C. § 841(h)(1).

19.     It is a crime to transmit or transfer funds from a place in the United States to or through a place outside the United States (or vice versa) with the intent to promote certain specified unlawful activities, including importation of merchandise contrary to law in violation of 18 U.S.C. § 545. 18 U.S.C. § 1956(a)(2)(A). It is also unlawful to conspire to make such transmissions or transfers. 18 U.S.C. § 1956(h).

## PROBABLE CAUSE

20.     I am currently investigating a person named George Kuiper ("G. KUIPER") and his associated websites New.nubrain.com, Nubrain.com, and Healthclown.com. The investigation began in 2009 after FDA/OCI received information from a Maine Police Department about an individual who had mistakenly received a package containing what appeared to be two prescription drugs, Selegiline, a drug approved by the FDA for the treatment of Parkinson's Disease, and Olmifon, the brand name for Adrafinil, a drug not approved by the

FDA. The intended recipient of the package was interviewed and identified the website

Nubrain.com as the site through which he placed the order for the drugs. The package had been

shipped with a return address of a post office box that was, at the time, rented by G. KUIPER.

21.     Since 2009, on eight occasions, FDA agents purchased modafinil, a prescription

drug and Schedule IV controlled substance, and other prescription drugs from Nubrain.com and

other websites operated by G. KUIPER without a prescription.  None of the drugs were approved

by the FDA.

22.     On September 12, 2019, agents accessed Healthclown.com a website known to be

operated by G. KUIPER.  Agents then ordered 120 200mg Modalert tablets, among other

products. No prescription or medical questionnaire was required, and no consultation with a

medical practitioner occurred prior to or after placing the order.   Modalert is not approved by the

FDA.

23.     On or about September 20, 2019, agents received a parcel with a return address of

Grayson, Georgia. The parcel contained five blister packs each containing 10 individually

wrapped Seleginine HCI tablets IP 5mg for a total of 50 pills, labeled "Manufactured by INTAS

PHARMACEUTICALS LTD.  7/3 GIDC Estate Varva, Ahmedabad 382 445 India" and 12

blister packs each containing 10 individually wrapped Modafinil tablets 200mg for a total of 90

pills, labeled "Modalert 200 Manufactured in India by: sun pharma laboratories ltd."

24.     On or about April 9, 2020, agents accessed Healthclown.com using the same

account information. Agents then ordered 120 200mg Modalert tablets, among other products.

No prescription or medical questionnaire was required, and no consultation with a medical

practitioner occurred prior to or after placing the order. Shortly after placing the order agents

received an email from sales@healthclown.com thanking them for the order. Over the next few

weeks, agents corresponded with this email address and nubrainorders@yahoo.com about the order. The agent was informed that there were shipping delays. On May 15, 2020, agents received another email saying, "as soon as shipper resumes we will let you know the problem is the flights leaving INDIA beyond control of supplier we are looking at another option." The suspected modalert tablets were eventually received by the agent in June at the FDA/OCI post office box in New Hampshire. The package was marked "Fedelty Healthcare PVT L.TD." which maintains a website advertising themselves as a drop shipper, a business which I know ships illegal pharmaceuticals on behalf of other suppliers or sellers. The parcel contained 12 blister packs marked modafinil and labeled 'Manufactured by sun pharma laboratories, ltd, Kamrup."

25.     On June 24, 2020, the FDA executed a federal search warrant at G. KUIPER's home in Georgia. They encountered G. KUIPER who agreed to speak with them. He admitted to selling modafinil on his website healthclown.com. He said that customers would order drugs on his website, and send money to him. G. KUIPER then would have the product shipped directly from overseas suppliers to the customer. G. KUIPER said that the suppliers would send him tracking numbers for the orders and G. KUIPER would pay suppliers using bank and wire transfers.

<u>Searches of G. KUIPER's Email Accounts</u>

26.     In November 2009, March 2015, January 2017, and May 2020 this Court issued search warrants for the email account, Nubrainorders@yahoo.com as well as other accounts used by G. KUIPER. I have reviewed over 9,000 emails contained in the most recent (May 2020) search warrant on <u>Nubrainorders@yahoo.com</u>.  Contained in those emails were over 500 emails between G. KUIPER using <u>Nubrainorders@yahoo.com</u> and <u>raghavgs2017@gmail.com</u>, the subject email account. The emails occurred between September 2019 and May 2020. The

majority of the emails discussed shipments of Modalert and other pharmaceutical products to customers in the United States and other countries.

27.     For example, on April 28, 2020, the user of raghavgs2017@gmail.com sent an email to G. KUIPER listing prices for certain pills. According to the email, the cost per pill for Modalert 200mg is 0.40/pill, and the cost per pill for Waklert 150mg: 0.40/pill. I know that Modalert is a product G. KUIPER offered for sale on his website, Healthclown.com and that Modalert contained the Schedule IV Controlled Substance, Modafinil. On May 5, 2020, G. KUIPER sent a response email to raghavgs2017@gmail.com inquiring about shipping pharmaceuticals from Singapore.

28.     Additionally, on January 7, 2020, sales@healthclown.com[1] received an order from jbor20212@yahoo.com for the purchase of "stay awake-200mg, Mod120, $245." I know based upon my investigation that "stay awake" and "Mod 120" refer to a product sold on the healthclown.com website maintained by G. KUIPER.  I am also aware that the "stay awake-200mg Mod 120" product contains the Schedule IV Controlled Substance, Modafinil, and is not approved for sale without a physician's prescription.  The email also contained a shipping and billing address of: Judith Borak, 7 Wellesley Drive, Pelham, New Hampshire 03076, United States.

29.     On January 9, 2020, nubrainorders@yahoo.com sent an email to raghavgs2017@gmail.com with an attached chart. Four separate names are listed in the body of the email. One of the names listed in the body of the email is "Borak." Additionally, listed in the

---

[1] Based on the undercover purchases, I know that this email address often responds to orders from the website. The emails were also often forwarded to nubrainorders@yahoo.com which is why I received them pursuant to the search warrant.

chart attached to the email is the following: "J. Borak, 7 Wellesley Dr., Pelham, N.H. 03076, 200mg x120 $53.30." Based upon my training and experience, and from the facts I have learned during this investigation I believe in this email dated January 9, 2020 G. KUIPER was informing his source of supply (the person using the subject account raghavgs2017@gmail.com) of the pending orders. I believe that G. KUIPER then expected the person using raghavgs2017@gmail.com to mail the illicit pharmaceutical product directly to J Borak at the New Hampshire address listed in the email.

30.     On January 13, 2020 at 1:07:12 AM UTC nubrainorders@yahoo.com wrote to raghavgs2017@gmail.com in part :"PLEASE ALWAYS WRITE TRACKING MODALERT ORDERS ETC ETC ETC DO NOT PUT "RE"."  The email was in response to an email raghavgs2017@gmail.com sent on January 7, 2020 in which raghavgs2017@gmail.com listed names, orders and tracking numbers. Later on that same day raghavgs2017@gmail.com wrote to nubrainorders@yahoo.com in part : "NB-10120-1, J. BORAK, Modalert ® 200mg (SunPharma Sikkim Pvt), 120, LT103972609SG."  According to the website 17track.net, a website that offers parcel tracking services for a number of different shipping carriers, parcel LT103972609SG originated in Singapore on January 13, 2020, and was delivered to Pelham, New Hampshire on January 25, 2020.  There are multiple other examples of the same type of communications back and forth between nubrainorders@yahoo.com and raghavgs2017@gmail.com.

31.     There were also a series of emails that discussed wiring of money.  For example, on September 30, 2019, nubrainorders@yahoo.com wrote in part to the subject account, "I was able to add $1000 more for a total of $6000." On September 17, 2019, nubrainorders@yahoo.com wrote in part to raghavgs2017@gmail.com: "$9000 HAS BEEN sent via Citibank."  Again on October 1, 2019, nubrainorders@yahoo.com wrote to

raghavgs2017@gmail.com in part, "6000 wire just sent from FIDELITY BANK, ps-may i begin

placing orders?, have heard nothing from CITIBANK re the prior wire of 9000, i believe the

problem may be the fact that i put BLUE SKY as the recipient which i then corrected."

32.     Through financial analysis of G. KUIPER's bank accounts I believe that the

payments nubrainorders@yahoo.com are referring to were designated for Seventh Sky in Fort

Mumbai, India.  During 2019, a total of four separate international wire transfers were sent from

the Fidelity Bank account maintained and controlled by G. KUIPER to a bank account in India

maintained by Seventh Sky.  The four wires totaled $23,000.  An additional two separate wires

were sent during 2019 from another bank account maintained and controlled by G. KUIPER at

Renasant Bank. The additional two wires totaled $7,000.

33.     In one email from September 2019, the subject email account included a signature

line "Rohit S. Rapid Pharmaceuticals."

34.     On June 19, 2020, I submitted a preservation request to Google for the subject

email account. In general, an email that is sent to an Google LLC subscriber is stored in the

subscriber's "mail box" on Google LLC's servers until the subscriber deletes the email.  If the

subscriber does not delete the message, the message can remain on Google LLC's servers

indefinitely. Even if the subscriber deletes the email, it may continue to be available on Google

LLC's servers for a certain period of time.

### BACKGROUND CONCERNING EMAIL

35.     In my training and experience, I have learned that Google LLC provides a variety

of on-line services, including electronic mail ("email") access, to the public.  Google LLC allows

subscribers to obtain email accounts at the domain name gmail.com like the email account listed

in Attachment A. Subscribers obtain an account by registering with Google LLC. During the

10

registration process, Google LLC asks subscribers to provide basic personal information. Therefore, the computers of Google LLC are likely to contain stored electronic communications (including retrieved and unretrieved email for Google LLC subscribers) and information concerning subscribers and their use of Google LLC services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

36.     A Google LLC subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by Google LLC.  In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, instant messages sent or received by the account holder, and attachments to emails, including pictures and files.

37.     In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

38.     In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

39.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

40.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the

information stored in connection with an email account can indicate who has used or controlled

the account. This "user attribution" evidence is analogous to the search for "indicia of

occupancy" while executing a search warrant at a residence. For example, email

communications, contacts lists, and images sent (and the data associated with the foregoing, such

as date and time) may indicate who used or controlled the account at a relevant time. Further,

information maintained by the email provider can show how and when the account was accessed

or used. For example, email providers typically log the Internet Protocol (IP) addresses from

which users access the email account, along with the time and date of that access. By

determining the physical location associated with the logged IP addresses, investigators can

understand the chronological and geographic context of the email account access and use relating

to the crime under investigation. This geographic and timeline information may tend to either

inculpate or exculpate the account owner. Additionally, information stored at the user's account

may further indicate the geographic location of the account user at a particular time (*e.g.*,

location information integrated into an image or video sent via email). Last, stored electronic

data may provide relevant insight into the email account owner's state of mind as it relates to the

offense under investigation. For example, information in the email account may indicate the

owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or

consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law

enforcement).

## **CONCLUSION**

41.     Based on the forgoing, I request that the Court issue the proposed search warrant.

42.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not

required for the service or execution of this warrant.  The government will execute this warrant

by serving the warrant on Google LLC.  Because the warrant will be served on Google LLC,

who will then compile the requested records at a time convenient to it, reasonable cause exists to

permit the execution of the requested warrant at any time in the day or night.


                Respectfully submitted,

                /s/ Jason Rameaka
                Jason Rameaka
                Special Agent
                FDA/Office of Criminal Investigations


The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim.
P. 4.1 and affirmed under oath the content of this affidavit and application.

Dated: July 24, 2020

Honorable Andrea K. Johnstone
United States Magistrate Judge

14

## **ATTACHMENT A**

### **Property to Be Searched**

This warrant applies to information associated with raghavgs2017@gmail.com that is stored at premises owned, maintained, controlled, or operated by Google LLC, an email provider headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043.

## ATTACHMENT B

### Particular Things to be Seized

### I.    Information to be disclosed by Google LLC (the "Provider")

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has peen preserved pursuant to a request made under 18 U.S.C. § 2703(f) on June 19, 2020, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.    The contents of all emails associated with the account from August 1, 2019 to the present, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.    All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.    The types of service utilized;

d.    All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, communications sent and received; and

2

e.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

The Provider is hereby ordered to disclose the above information to the government within fourteen (14) days of issuance of this warrant.

**II.**     **Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence, and instrumentalities of violations of Title 21, United States Code, §§ 331(a), 331(d) (introduction of misbranded drugs into interstate commerce), 841(a), 846, (distribution and conspiracy to distribute controlled substances) 952(b), and 963 (unlawful importation of controlled substances), and Title 18, United States Code, §§ 371, 545 (conspiracy and importation contrary to law), 1956(a)(2), and 1956(h) (money laundering) that have been committed by G. KUIPER, the user of raghavgs2017@gmail.com and co-conspirators occurring after **August 1, 2019**, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

A.   The unlawful sale, purchase, shipment, importation, holding, processing, packaging, labeling and/or distribution of modafinil or other drugs, including misbranded drugs, unapproved new drugs, and/or controlled substances;

B.   The source and manufacture of unlawfully distributed drugs, any person or entity in the chain of distribution of drugs, any person or entity involved in collecting and/or distributing the proceeds of the sale of drugs;

C.   Financial transactions related to the distribution of drugs, including, but not limited to the transfer of funds from a place in the U.S. to or through a place outside the U.S. (or vice versa);

D.   Communication between or among raghavgs2017@gmail.com, and suspected potential or actual customers purchasing drugs;

E.   Communication between or among raghavgs2017@gmail.com, and suspected potential or actual suppliers of drug products;

4

F.   The source, transfer, or disposition of funds belonging to raghavgs@gmail.com;

G.   The travel or whereabouts of raghavgs@gmail.com, or of any co-conspirators;

H.   The identity, location, and ownership of any computers used to access the account or any associated e-mail accounts;

I.   Other e-mail or internet accounts providing internet access or remote data storage used by raghavgs2017@gmail.com;

J.   The existence and identity of any co-conspirators;

K.   Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

L.   Evidence indicating the email account owner's state of mind as it relates to the crime under investigation; and

M.   The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by Google LLC and my title is

_____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of Google LLC.  The attached records consist of _____ (pages/CDs/megabytes).  I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Google LLC, and they were made by Google LLC as a regular practice; and

b. such records were generated by Google LLC's electronic process or system that produces an accurate result, to wit:

1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Google LLC in a manner to ensure that they are true duplicates of the original records; and

2. the process or system is regularly verified by Google LLC, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____     _____

Date                                Signature